## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| **v.** | ) **Cr. No.  19-21 KBJ** |
| | ) |
| **Jeremy Sears** | ) |
| | ) |

\*\*\*\*\*

## <u>MEMORANDUM IN AID OF SENTENCING</u>

Jeremy Sears, by his attorney, Mark J. Carroll, hereby submits the following memorandum in aid of sentencing in this matter. Pursuant to the sentencing factors set forth in 18 U.S.C. §3553(a) as delineated in <u>Rita v. United States</u>, 127 S. Ct. 2456 (2007), <u>Kimbrough v.United States</u>, 128 S. Ct. 558 (2007), <u>Gall v. United States</u>, 128 Ct. 586 (2007) and <u>Nelson v.United States</u>, 555 U.S. 338 (2009), Mr. Sears respectfully requests the Court to impose a sentence of five years.  Mr. Sears  submits that the requested sentence is "sufficient, but not greater than necessary, to comply with the purposes" set forth in 18 U.S.C. §3553. Sentencing is currently scheduled for May 15, 2019 at 2:30 p.m., before the Honorable Ketanji Brown-Jackson. In support of this request, counsel states:

**FACTUAL**
**BACKGROUND**

Mr. Sears was arrested in this case on June 28, 2018 and has been held without bond ever since at the D.C. Jail.

On January 25, 2019 the United States Attorney for the District of Columbia filed a one-count Information charging Jeremy Sears with Distribution of Child Pornography, in violation of 18 USC § 2252(a)(2)  The criminal conduct charged in the Information occurred between on or about December 17, 2017, and on or about December 26, 2017.

On February 21, 2019, the earliest possible date, the defendant pleaded guilty to the Information, pursuant to a written Rule 11(c)(1)(B) plea agreement. The statutory penalties associated with the count of conviction calls for a mandatory minimum term of five years imprisonment. The plea agreement calls for a Guideline sentence of  97 to 121 months.

The parties agreed that the applicable base offense level is 22, pursuant to U.S.S.G. § §2G2.2(a)(2). The parties also agree to the following calculations:

**Specific Offense Characteristics:** The material involved a prepubescent minor or minor under the age of 12. Therefore, two levels are added. USSG §2G2.2(b)(2). **+2**

**Specific Offense Characteristics:** The defendant knowingly engaged in distribution of child pornography. Therefore, two levels are added. USSG §2G2.2(b)(3)(F). **+2**

**Specific Offense Characteristics:** The offense involved the use of a computer or an interactive computer service for the possession, transmission, receipt, or distribution of child pornography,

or for accessing with intent to view child pornography. Therefore, two levels are added. USSG §2G2.2(b)(6). **+2**

**Specific Offense Characteristics**: The offense involved 600 or more images of child pornography. Therefore, five levels are added. USSG §2G2.2(b)(7)(D). **+5**

**Adjusted Offense Level (Subtotal): 34**

**Acceptance of Responsibility:** Additionally, the parties agree that a three-point reduction would apply pursuant to U.S.S.G. § 3El.l(a) & (B); upon the defendant demonstrating acceptance of responsibility for the offense, and assisting authorities in the investigation or prosecution of the misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Government and the Court to allocate their resources efficiently.

**Total Offense Level: 31**

The presentence report writer added the following upward adjustment:

**Specific Offense Characteristics:** The offense involved material that portrays sadistic or masochistic conduct. Therefore, four levels are added. USSG §2G2.2(b)(4)(A). **+4**

We disagree with her calculation.  The government does as well, as the prosecutor stated in her response to the PSR:

> The government has only one comment and it is with respect to the disparity in the guideline calculation and why the 4 points was not included in the plea paperwork.
>
> The government agrees that the caselaw outside of the District of Columbia supports a 4-level enhancement under USSG §2G2.2(b)(4)(A) for sadistic or masochistic images due to the images in this case depicting penetration of prepubescent minors.

There is, however, no D.C. caselaw on this issue.  Because the defendant is resolving the case with a pre-indictment plea offer, the parties agreed based on the facts and circumstances of this case not to include this enhancement to limit litigation at sentencing of disputed issues.

Therefore, the parties agreed that the total offense level is 31. The pre-sentence report writer computed the defendant's Criminal History Points to be zero, thus assigning him to Category I, which results in a total offense level of 31, and a range of 97 to 121 months imprisonment.

## THE LEGAL FRAMEWORK FOR CHILD PORNOGRAPHY AND OTHER SEXUAL OFFENSE CASES IN THIS DISTRICT

Since at least as far back as 2014, a standard procedure has evolved for the cases arising from the same sting operation utilized here.  Although the sentences imposed have varied significantly, *see infra*, the plea agreements, the Guidelines ranges, and the government's sentencing recommendations have all been substantially the same.

A good comparison can be drawn with this case,  Distribution of Child Pornography, in violation of 18 USC § 2252(a)(2), with Travel With Intent to Engage in Illicit Sexual Conduct, in violation of 18 USC §2423(b), and Possession of Child Pornography, in violation of 18 USC § 2252A(a)(5)(B). The seriousness of these  offenses are greatly overstated by the Guidelines because of the near-automatic application of many of the enhancements that are present in this case. Mr. Sears's base offense level for the offense level of distribution of child pornography is enhanced by 15 levels, resulting in a sentencing guideline range that is far greater than that

which is sufficient to meet the sentencing purposes. We submit that using Mr. Sear's  proposal

for a five year sentence results in a more rationale sentencing framework.

Starting with the plea agreement, the plea agreements in *United States v. Michael Gutierrez*, 14-cr-194 (JEB), *United States v. Marc Singleton*, 14-cr-206 (RMC), *United States v. Matthew Nori*, 14-cr-191 (RC), *United States v. Michael Carter*, 15-cr-02 (CKK) and in this case have all been pretty much the same.  In the agreements, the parties discuss how the Guidelines should apply.  The parties first acknowledge that, as a technical matter, the U.S.S.G. § 2A3.1 cross-reference would apply because the fictitious minor was said to be under 12 years-old.  This results in a switch from the typical travel-with-intent Guideline, U.S.S.G. § 2G1.3, which carries a base offense level of 24, to U.S.S.G. § 2A3.1, which carries a base offense level of 30.  In what looks like a clear case of double-counting, the offense level is then increased a second time for the minor being under 12, to a total offense level of 34.  The defendant is then credited with three points for accepting responsibility, for a total adjusted offense level of 31 and a Guidelines range in the neighborhood of 108-135 months, or more depending on the defendant's criminal history.

In cases where the UC has selected the age of the fictitious minor and the defendant had demonstrated no specific preference for a minor under 12, the plea agreement in these cases suggests that the government is open to the Court departing downward in the Guidelines. In the instant case, the defendant stated that he had a 10 year old daughter without specifically saying that this age group was his preference.

In other similar cases, in cases where the UC has selected the age of the fictitious minor and the defendant has demonstrated no specific preference for a minor under 12, the plea agreements  suggests not applying the cross-reference.  Specifically, in a footnote to the Guidelines calculation, the plea agreement suggests remaining with the typical travel-with-intent

guideline, U.S.S.G. § 2G1.3.  The agreements also suggests discounting the 8-level enhancement under U.S.S.G. § 2G1.3(b)(5) for the "minor" being under 12 years old.  In the other cases involving this arrangement, the footnote states:

> The government does not oppose the court's consideration of a downward variance related to the age of the victim given the facts and circumstances of the instant case.  If this were a case in which the victim was age 12 or older, the cross reference under § 2A3.1 would not apply nor would the 8 point enhancement under § 2G1.3(b)(5) (Offense involved minor under 12).  In such a case the defendant's total adjusted offense level, after the -3 points for acceptance of responsibility, would be a 21.

*See* Plea Agreement in *United States v. Michael Carter*, 15-cr-02 (CKK) p. 3 n.1; *see also, e.g.*, Plea Agreement in *United States v. Marc Singleton*, 14-cr-206 (RMC), p. 3 n.1 (containing the same footnote)).  In a case where the defendant's criminal history is category I, the Guidelines range using this calculation is 37-46 months;.  In *United States v. Michael Carter*, 15-cr-02 (CKK) because he is in criminal history category III, the Guidelines range would be 46-57 months, *prior to any departure for his medical condition*.  *See* Plea Agreement, p. 3 n.1.

As noted, counsel is aware of four cases where the above plea agreement was utilized and the defendants have already been sentenced.  Based on a review of those cases, only the *Carter* case involved serious medical issues like Mr. Sears is suffering from.  The prior cases have played out as set forth below.

In *United States v. Michael Gutierrez*, 14-cr-194 (JEB), the defendant pled guilty to traveling with intent to engage in illicit sexual conduct with a minor who was under the age of twelve, in violation of 18 U.S.C § 2423(b).  The sentencing guideline range that applied in Mr. Gutierrez's case was 108-135 months because the fictitious minor was only supposed to be 8 years-old.  The government requested a sentence of 60 months.  On February 9, 2015, Judge Boasberg imposed a sentence of 33 months.

Similarly, in *United States v. Marc Singleton*, 14-cr-206 (RMC), Mr. Singleton was likewise looking at a sentencing guidelines range of 108-135 months because the minor was supposed to be only 8 years-old.  The government again sought a sentence of 60 months.   Judge Collyer sentenced Mr. Singleton to just 12 months and 1 day in prison.

And in *United States v. Matthew Nori*, 14-cr-191 (RC), Mr. Nori was looking at a sentencing guidelines range of 135-168 months because the minor was supposed to be only 8 years-old.  In *Nori*, there was also a factual wrinkle in that the parties submitted a "sealed addendum" to the Statement of Offense, where the defendant "admitted to . . . additional facts." Gov. Sentencing Memo in *Nori*, at 1 n.1.  While the additional facts are unknown to undersigned counsel, the government described those facts as "demonstrat[ing] the defendant's seriousness in communicating with the undercover detective."  *Id.*; *see also id.* at 12 ("The defendant's conduct described in the sealed addendum to the statement of offense shows that the defendant was serious, the defendant had a sexual interest in children, and the defendant was willing to engage in troubling behavior.").  Mr. Nori had also previously been sent to a sex addict support group for a year when his wife caught him watching pornography.  *See id.* at 13.  The government sought a sentence of 66 months, and Judge Contreras imposed a sentence of 60 months.

In *United States v. Michael Carter*, 15-cr-02 (CKK), the defendant pled guilty to traveling with intent to engage in illicit sexual conduct with a minor who was under the age of twelve, in violation of 18 U.S.C § 2423(b).  The sentencing guideline range that applied in Mr. Carter's  case was 135-168 months because the fictitious minor was only supposed to be 8 years-old.  The government requested a sentence of 46 months.   On February 11, 2016, Judge Kollar-Kotelly  imposed a sentence of 36 months.

In cases involving both Travel With Intent to Engage in Illicit Sexual Conduct, in violation of 18 USC §2423(b); and Possession of Child Pornography, in violation of 18 USC § 2252A(a)(5)(B),  the sentences imposed have varied significantly, *see infra*, the plea agreements, the Guidelines ranges, and the government's sentencing recommendations have all been substantially the same.

However, especially with respect to the possession of child pornography, the seriousness of the offense is greatly overstated by the Guidelines because of the near-automatic application of many of the enhancements that are present in this case. Mr. Sear's base offense level for the offense level for distribution of child pornography was enhanced by 15 levels by the probation office, resulting in a sentencing guideline range that is far greater than that which is sufficient to meet the sentencing purposes.

## ARGUMENT

I.     **The Relevant Law of Federal Sentencing, Generally.**

In *United States v. Booker*, the Supreme Court excised the statutory section that once made the Sentencing Guidelines mandatory, rendering them advisory. 543 U.S. at 245; *see also United States v. Bras*, 483 F.3d 103, 105 (D.C. Cir.2007). Previously, sentencing courts were required to impose a within-Guidelines sentence unless circumstances warranted a departure. See 18 U.S.C. § 3553(b)(1). As a consequence of *Booker*, judges now must only "consider" the Guidelines "together with other sentencing factors." *Booker*, 543 U.S. at 259 (emphasis added). In so doing, a judge "may not presume that the Guidelines range is

reasonable but must make an individualized assessment based on the facts presented." *Gall v.*

*United States*, 552 U.S. 38, 39 (2007).

In *United States v. Rita*, 128 S. Ct. at 594, the Supreme Court noted that some sections

of the Guidelines are "the product of careful study based upon extensive empirical evidence

derived from review of thousands of individual sentencing decisions." The Supreme Court,

however, recognized that "not all of the guidelines are tied to this empirical evidence." Id. at

594, n.2. Subsequent to *Rita,* the Court clarified that sentencing courts may vary from the

Guidelines based on policy disagreements alone. *Spears v. United States*, 129 S.Ct. 840

(2009).

While this Court must still correctly calculate the guideline range, *Gall v. United States*,

552 U.S. 38, 49 (2007), it may not treat that range as mandatory or presumptive, *id.* at 51;

*Nelson v. United States*, 555 U.S. 350, 352 (2009), but must treat it as "one factor among

several" to be considered in imposing an appropriate sentence under § 3553(a). *Kimbrough v*

*United States*, 552 U.S. 85, 90 (2007). The Court must "consider all of the § 3553(a) factors,"

"make an individualized assessment based on the facts presented," *id.* at 49-50, and explain

how the facts relate to the purposes of sentencing. *Id.* at 53-60; *Pepper v. United States*, 131

S. Ct. 1229, 124243 (2011). The Court's "overarching" duty is to "'impose a sentence

sufficient, but not greater than necessary' to accomplish the goals of sentencing." *Id.* at 101;

*Pepper*, 131 S. Ct. at 1242-43.

A key component of Supreme Court law, designed to ensure that the guidelines are truly

advisory and constitutional, is the authority of this Court to disagree with a guideline as a

matter of policy. Because "the Guidelines are now advisory . . . , as a general matter, courts

may vary [from Guidelines ranges] based solely on policy considerations, including

disagreements with the Guidelines." *Kimbrough*, 552 U.S. at 101-02 (internal punctuation

omitted) (citing *Rita v. United States*, 551 U.S. 338, 351 (2007) (district courts may find that

the "Guidelines sentence itself fails properly to reflect § 3553(a) considerations"). As the

Supreme Court held in *Kimbrough*, because "the cocaine Guidelines, like all other Guidelines,

are advisory only," it "would not be an abuse of discretion for a district court to conclude when

sentencing a particular defendant that the crack/powder disparity yields a sentence 'greater than

necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Kimbrough*, 552 U.S. at

91, 109-10; *see also Spears v. United States*, 555 U.S. 261, 267 (2009) ("[D]istrict courts are

entitled to vary from the crack cocaine Guidelines in a mine-run case where there are no

'particular circumstances' that would otherwise justify a variance from the Guidelines'

sentencing range.").

Congressionally directed guidelines are just as advisory as any other guideline and

therefore equally subject to policy-based variances. In *Vazquez v. United States*, 130 S. Ct.

1135 (2010), the Supreme Court remanded for reconsideration in light of then-Solicitor

General Kagan's position that "all guidelines," including congressionally-directed guidelines,

"are advisory, and the very essence of an advisory guideline is that a sentencing court may,

subject to appellate review for reasonableness, disagree with the guideline in imposing

sentencing under Section 3553(a)." U.S. Br. at 11, *Vazquez v. United States*, No. 09-5370(Nov.

2009). This Court may, as it already has in other very similar cases,[1] thus properly find that the

child pornography guideline was not developed by the Commission in its characteristic

institutional role of basing its determinations on empirical data and national experience, *see*

*Kimbrough*, 552 U.S. at 109-10, consistent with the Supreme Court's repeated recognition that

when a guideline was not developed by the Commission based on empirical data of past

sentencing practices and national sentencing experience, it is not likely that the guideline

"reflect[s] a rough approximation of sentences that might achieve § 3553(a)'s objectives." *See*

---

[1] Counsel notes in particular the very similarly situated defendant Judge Howell sentenced the defendant to 51 months pursuant to the "travel" guidelines. *United States v. John Cunningham*, Cr. No. 13-288 (BAH).

*Kimbrough*, 552 U.S. at 109-10; *Spears*, 555 U.S. at 264; *Rita*, 551 U.S. at 348, 349-50.[2]

**2. The Sentencing Commission's Report to Congress and The *Stabenow* Report.**

In February 2013, the Sentencing Commission released a report to Congress on the

child pornography guidelines. *See* U.S. Sent'g Comm'n, *Report to the Congress: Federal*

---

[2] *See also United States v. Grober*, 624 F.3d 592, 600-01 (3d Cir. 2010) (applying abuse of discretion review to a district court's policy-based downward variance from § 2G2.2 because "the Commission did not do what 'an exercise of its characteristic institutional role' required—develop § 2G2.2 based on research and study rather than reacting to changes adopted or directed by Congress"); *id.* at 608-09 ("Congress, of course. . . may enact directives to the Commission which the Commission is obliged to implement," but "*Kimbrough* permits district courts to vary even where a guideline provision is a direct reflection of a congressional directive"); *United States v. Dorvee*, 616 F.3d 174, 188 (2d Cir. 2010) (*Kimbrough's* holding that "it was not an abuse of discretion" for a district court to disagree with the crack guidelines "because those particular Guidelines 'do not exemplify the Commission's exercise of its characteristic institutional role' . . . applies with full force to § 2G2.2."); *United States v. Henderson*, 649 F.3d 955, 959-60 (9th Cir. 2011) ("[T]he child pornography Guidelines were not developed in a manner 'exemplify[ing] the [Sentencing] Commission's exercise of its characteristic institutional role,' . . . so district judges must enjoy the same liberty to depart from them based on reasonable policy disagreement as they do from the crack-cocaine Guidelines discussed in *Kimbrough*."); *id.* 963 n.3 ("That Congress has the authority to issue sentencing directives to the Commission" and "that the Guidelines conform to Congressional directives does not insulate them from a *Kimbrough* challenge."); *United States v. Stone*, 575 F.3d 83, 89-90 (1st Cir. 2009) ("[O]ur precedent has interpreted *Kimbrough* as supplying this power even where a guideline provision is a direct reflection of a congressional directive," including the career offender, fast-track, and child pornography guidelines); *id.* at 93-94, 97 (district court may choose to agree with Congress's policy decisions as long as it recognizes its authority not to, but the "guidelines at issue are in our judgment harsher than necessary" and "we would have used our *Kimbrough* power to impose a somewhat lower sentence"); *United States v. Halliday*, 672 F.3d 462, 474 (7th Cir. 2012) (district courts are "at liberty to reject any Guideline on policy grounds," but defendant did "not argue that the district court was unaware of its discretion to disagree with the [child pornography] Guidelines"); *United States v. Regan*, 627 F.3d 1348, 1353-54 (10th Cir. 2010) (defendant's argument for a policy-based variance from § 2G2.2 was "quite forceful" but he "did not raise the argument that the Guidelines are entitled to less deference because they are not the result of empirical study by the Commission").

*Child Pornography Offenses* (2012) ["*Child Porn Report*"]. The Commission explained that it

compiled the report in large part due to the increasing rate of below-guideline sentences for

offenders sentenced under USSG § 2G2.2, pursuant to its statutory duty to "consider whether

the guidelines are in need of revision in light of feedback from judges as reflected in their

sentencing decisions," *id.* at ii, and because "as a result of recent changes in the computer and

Internet technologies that typical non-production offenders use, the existing sentencing scheme

in non-production cases no longer adequately distinguishes among offenders based on their

degrees of culpability." *Id.* at ii, 323.

The Commission explained that because the enhancements for computer use and type

and volume of images "now apply to most offenders," the guideline "fail[s] to differentiate

among offenders in terms of their culpability." *Id.* at iii, xi; *id.* at 209, 323. It explained that

"technological changes have resulted in exponential increases in the volume and ready

accessibility of child pornography, including many graphic sexual images involving very young

victims, a genre of child pornography that previously was not widely circulated." *Id.* at 6.

Because "sentencing enhancements that originally were intended to provide additional

proportional punishment for aggravating conduct now routinely apply to the vast majority of

offenders," *id.* at xi, the "current guideline does not adequately distinguish among offenders

regarding their culpability for their collecting behaviors," *id.* at 323. The cumulative

enhancements addressing the content and volume of images possessed, "in addition to base

offense levels of 18 or 22, result[] in guideline ranges that are overly severe for some offenders

in view of the nature of their collecting behavior." *Id.*

In describing the varying degrees of culpability, the Commission reported that the

"typical" child pornography case now involves images depicting "prepubescent children

engaging in sexually explicit conduct." *Id.* at 84. Some offenders "acquire enormous and often

well-organized collections," sometimes up to hundreds of thousands of images; some

"intentionally collect child pornography depicting the sexual torture of children, including

infants and toddlers," *id.* at viii, 84-92; and some have collected material over "a series of

decades" beginning in the pre-Internet era, *id.* at 80. The variety of images readily available on

the Internet and found in offenders' possession ranges from "legal but sexually suggestive

poses" to extremely graphic images "depicting violence, humiliation, bondage, and bestiality."

*Id.* at 80-81, 90-91. Some offenders "are very discriminating" and limit their collection by

preference. *Id.* at 81. Offenders "vary widely in their technological sophistication," with some

relatively unsophisticated offenders using widely available peer-to-peer to receive or distribute

material "in an indiscriminate manner," while others "use their technological expertise to create

Page 14

private and secure trading 'communities' and to evade, and help others evade, detection by law enforcement." *Id.* at viii, 61-62.

The Commission reported that approximately one quarter of federal offenders "received child pornography from commercial websites, thereby fostering the commercial markets," and one quarter engaged in "personal distribution" to another individual through bartering or trading of images, also described as a "market." *Id.* at 98-99. There is, however, no social science research available to support the theory that criminal punishments "have affected commercial or non-commercial 'markets' in child pornography since the advent of the Internet and P2P file sharing." *Id.* at 98.

The Commission reported that some offenders have "non-sexual motivations for viewing child pornography," including "avoidance of stress or dissatisfaction with life." *Id.* at 79. It reported that recent studies show that "appropriate 'treatment interventions . . . are associated with lower rates of recidivism—some of them very significant,'" *id.* at 278 & n.31 (quoting Center of Sex Offender Management, *The Comprehensive Approach to Sex Offender Management* 5 (2008)), and that "[p]olygraph testing of sex offenders is widely accepted by experts as a critically important corollary of effective treatment." *Id.* at 282.

The Commission reported that "not all child pornography offenders are pedophiles or

engage in other sex offending." *Id.* at 104. Approximately one in three offenders sentenced

under § 2G2.2 "have engaged in" what the Commission deems "sexually dangerous behavior,"

criminal or non-criminal, past or present, based on allegations in PSRs, arrests, and convictions.

*Id.* at ix-x, 204-05. However, "the current guideline measures for offender culpability (e.g., for

distribution of child pornography, number of images possessed, possession of sado-masochistic

images) are generally not associated with significantly higher rates of [criminal sexually

dangerous behavior]." *Id.* at 204.

The Commission concluded that "[t]he current sentencing scheme in § 2G2.2 places a

disproportionate emphasis on outdated measures of culpability regarding offenders' collecting

behavior and insufficient emphases on offenders' community involvement and sexual

dangerousness." *Id.* at xx; *see also id.* at 321. The Commission asked Congress to enact

legislation to provide it authority to amend the guidelines that "were promulgated pursuant to

specific congressional directives or legislation directly amending the guidelines." *Id.* at xviii,

322.

The Commission recommends that the specific offense characteristics related to the

types and volume of images, distribution, and use of a computer "be updated to account more

meaningfully for the current spectrum of offense behavior regarding the nature of images, the

volume of images, and other aspects of an offender's collecting behavior reflecting his

Page 16

culpability (e.g., the extent to which an offender catalogued his child pornography collection by topics such as age, gender, or type of sexual activity depicted; the duration of an offender's collecting behavior; the number of unique, as opposed to duplicate, images possessed by an offender)," and "to reflect offenders' use of modern computer and Internet technologies." *Id.* at xviii-xix, 322-23.

The current guideline at issue in this case, U.S.S.G. § 2G2.2(a)(2), is the perfect example of a non-empirically based guideline. The guideline does not represent the Sentencing Commission's exercise of its characteristic institutional role and therefore deserves minimal deference. *See, e.g., United States v. Grossman*, 513 F.3d 592 (6th Cir. 2008); *United States v. Baird*, 580 F. Supp. 2d 889, 895 (D. Neb. 2008) ("[B]ecause [2G2.2] does not reflect the Commission's unique institutional strengths, the court affords them less deference than it would to empirically grounded guidelines.").

The Sentencing Commission itself has acknowledged that U.S.S.G. § 2G2.2 is not the product of "empirical data and national experience" but instead a response to the creation of mandatory minimum sentences and specific congressional directives. *United States Sentencing Commission, Fifteen Years of Guideline Sentencing*, at 73 (Nov. 2004) ("frequent mandatory minimum legislation and specific directives to the Commission to amend the Guidelines make it difficult to gauge the effectiveness of any particular policy change, or to disentangle the influences of the Commission from those of Congress"); *United States v. Hanson*, 561 F. Supp.

2d 1004 (E.D. Wisc. 2008); *Baird*, 580 F. Supp. 2d at 892 ("when Guidelines are not the result

of 'the Commission's exercise of its characteristic institutional role,' such as when they are not

based on an empirical approach, but are instead keyed to or guided by statutory directives, a

court is not presented with an 'ordinary case,' in which 'the Commission's recommendation of

a sentencing range will reflect a rough approximation of the sentences that might achieve

§3553(a)'s objectives'"); *United States v. Johnson,* 588 F. Supp. 2d 997, 1004 (S.D. Iowa)

("because [U.S.S.G. 2G2.2 does not] reflect the unique institutional strengths of the Sentencing

Commission in that they are not based on study, empirical research, and data, the Court . . .

affords them less deference that it would to empirically-grounded guidelines").

As noted above, both district court judges and legal commentators have described

U.S.S.G. § 2G2.2 as "seriously" flawed not only because § 2G2.2 was promulgated in a manner

inconsistent with the approved practices of the Sentencing Commission, but also because

U.S.S.G § 2G2.2 does not adequately reflect important distinctions in levels of culpability

among defendants convicted of shipping or transporting images containing child pornography.

As discussed by AFPD Troy Stabenow in *Deconstructing the Myth of Careful Study: A Primer

on the Flawed Progression of the Child Pornography Guidelines*, available at

http://sentencing.typepad.com (January 1, 2009) (hereinafter "*Stabenow*"), using the "empirical

approach" the Sentencing Commission initially created a Base of Offense Level of 13 for

U.S.S.G. § 2G2.2. The Commission explained:

> It is important for Congress to recognize that the Commission is now in a position to provide, to an extent unparalleled by previous sources, detailed data on actual sentencing practices under the guidelines-information that we hope Congress will consider in its decision on sentencing policy

*Stabenow* at p. 5.

Today, the corresponding Base Offense Level for the distribution of child pornography is 22, nine levels higher. This dramatic increase was not the result of the "empirical approach" used by the Sentencing Commission in determining the original Base Offense Level at 13, but instead "the result of arbitrary increases by Congress slipped into other bills, often with little or no debate." *Hanson*, 561 F. Supp. 2d at 1010.

Unwarranted increases have not been limited to the Base Offense Level of U.S.S.G. § 2G2.2. Unwarranted increases have also occurred in the context of Specific Offense Characteristics. As Judge Adelman notes, many of the Specific Offense Characteristics in U.S.S.G. § 2G2.2, such as the enhancement for "number of images" (which adds up to 5 levels to the Offense Level), were enacted without any "research, study or rationale." 561 F. Supp. 2d at 1010.

While many subsections of U.S.S.G. § 2G2.2 were promulgated with little or no empirical analysis, other subsections continue to be applied notwithstanding the fact that they

do not address the concerns sought to be addressed by U.S.S.G. § 2G2.2. For example, the two

level Specific Offense Characteristic enhancement for the "use of a computer," 2G2.2(b)(6),was

designed to 1) fight the wide dissemination and instantaneous transmission in computer-assisted

trafficking of child pornography, 2) combat the increased difficulty of investigation

and prosecution by law enforcement officials, 3) minimize the increased likelihood that child

pornography will be viewed by and harm children, and 4) limit the potential for pedophiles to

lure children into sexual relations through the computer. *Stabenow* at p. 14. Yet, the

enhancement is applied in almost every single case. That is not what Congress intended. See

id. at p. 16 ("if a client today used a computer, but did not widely disseminate the images, did

not use them to entice or coerce a child, and did not show them to a child, then their conduct is

completely outside the scope of the fear that prompted Congress to require the enhancement").

U.S.S.G. § 2G2.2 has also been repeatedly criticized because of its numerous other (and

significant) Specific Offense Characteristics that are rarely case-specific or unique, but instead

present in almost every single case: 2G2.2(b)(2): images containing children under twelve – 2

level increase; 2G2.2(b)(7): multiple images – up to a 5 level increase; and 2G2.2(b)(4):

material that portrays sadistic or masochistic conduct – 4 levels. *See Grober*, 595 F. Supp. 2d

at 397 (using the offense characteristics "to enhance the base offense level [of § 2G2.2] is

irrational because logically and factually, the characteristics are simply not genuine aggravating

factors. Rather, they are inherent in just about any downloading offense").

The sentencing scheme under USSG § 2G2.2 therefore not only destroys the distinction between "true peddlers of child pornography and more simple possessors or transporters," Hanson, 561 F. Supp. 2d at 1009, it also fails "to adequately reflect those important distinctions in levels of culpability" among defendants sentenced pursuant to 18 U.S.C. §2252A. *United States v. Baird*, 580 F. Supp. 2d 889, 895 (D. Neb. 2008).

Because USSG § 2G2.2 does not reflect the Sentencing Commission's unique role of relying on evidence and study to develop sound sentencing practices, and produces advisory sentencing ranges that are far greater than necessary to serve the statutory purposes of federal sentencing, courts throughout the country—and in this District—accord USSG § 2G2.2 minimal deference at best. Mr. Sears urges this Court to adopt the same approach in sentencing him. As discussed herein, Mr. Sears submits that full consideration of the § 3553 factors in this case support a sentence of five years.

**II. The Section 3553 Factors as Applied to Mr. Sears Support a Sentence of No more than five years.**

As noted above, pursuant to 18 U.S.C. §§ 3562 and 3553(a), sentencing courts should consider the need for the sentence imposed 1) to reflect the seriousness of the offense, to

promote respect for the law, and to provide just punishment for the offense; 2) to afford

adequate deterrence to criminal conduct; 3) to protect the public from further crimes of the

defendant; and 4) to provide the defendant with the needed educational and vocational training,

medical care, or other correctional treatment in the most effective manner.

Section 3553(a) further directs sentencing courts to consider the nature and

circumstances of the offense, the history and characteristics of the defendant, the range of

sentences available, the need to avoid unwanted sentencing disparities among defendants with

similar records who have been found guilty of similar conduct, and the need to provide

restitution to any victims of the offenses charged. Specifically, courts should "impose a

sentence sufficient, but not greater than necessary, to comply with the purposes" set forth

above.

In enacting the Sentencing Reform Act, Congress did "not favor[] one purpose of

sentencing over another," except that rehabilitation was not to be a reason to impose a sentence

of incarceration. *See* S. Rep. No. 98-225, at 67 (1983). Rather, "each of the four stated

purposes should be considered in imposing sentence in a particular case," and "one purpose of

sentencing may have more bearing on the imposition of sentence in a particular case than

another purpose has." *Id.* at 68. In choosing what kind of sentence to impose, the court "must

consider" all of the purposes and factors set forth in § 3553(a). *Id.* at 119. "Whether [imprisonment] should be imposed when authorized is a question to be resolved after balancing all the relevant considerations." *Id.; see also United States v. Bridgewater*, 479 F.3d 439, 442 (6th Cir. 2007) ("often one or two [purposes] prevail, while others pale").

Here, all of the purposes of sentencing point in the same direction. Mr. Sears offense is less serious than the offenses Congress had in mind, and Mr. Sears is not the dangerous offender Congress envisioned. Incarceration of 60 months is more than sufficient to meet the concerns Congress expressed.

## A. The Need for Just Punishment in Light of the Seriousness of the Offense, 18 U.S.C. § 3553(a)(2)(A).

### 1. Seriousness of the offense.

Congress's actions with respect to the child pornography guideline have stemmed in large part from the belief that those who view child pornography are actually child molesters.[3]

---

[3] *See* 137 Cong. Rec. S10323 (July 18, 1991) (Senator Helms) (in support of directing increase to base offense level from 10 to 13); *id.* at H6736, H6738 (Sept. 24, 1991) (Representative Wolf) (same); 141 Cong. Rec. S5509 (Apr. 6, 1995) (Senator Grassley) (in support of directing additional increase in base offense level from 13 to 15); 144 Cong. Rec. S12262 (Oct. 9, 1998) (Senator Hatch) (in support of directing expanded reach of "distribution" enhancement); 149 Cong. Rec. S5126 (Apr. 10, 2003) (Senator Hatch) (in support of Feeney Amendment, which included number-of-images enhancement); *see also* Child Pornography Prevention Act of 2006, Pub. L. No. 104-208, § 121, 110 Stat. 3009, 3009-26 (1996); S. Rep. No. 108-2, at 3 (2003); S. Rep. No. 104-358, at 12-14 (1996); USSG app. C, amend. 592 (Nov.

Under this view, punishing child pornography possessors or receivers serves as a proxy for

punishing child sexual abusers. Aside from the lack of evidence to support this belief in

general, *see Child Porn Report* at 104 (confirming that "not all child pornography offenders are

pedophiles or engage in other sex offending"), Mr. Sears has not been convicted of

sexually abusing a child and has not in fact sexually abused a child. This distinguishes Mr.

Sears from the offenders Congress had in mind and is therefore highly relevant. *See*

*United States v. Marshall*, 870 F. Supp. 2d 489, 491-92 (N.D. Ohio 2012) (rejecting

presumption that "those who view child pornography are indistinguishable from those who

actually abuse children," finding instead that the "[e]mpirical data strongly suggests that

viewing child pornography does not equate to child molestation"); *United States v. Kelly*, 868

F. Supp. 2d 1202, 1207-08 (D.N.M. 2012) (rejecting government's argument that guideline

range is appropriate because of the "chance that [defendant] will molest children in the future,

or that he has in the past," as this "speculation is directly contrary to submissions by Kelly's

therapist and Kelly's psychiatrist," the defendant "has never been accused of hands-on abuse,"

"empirical testing disproves the fear that the typical child pornography defendant will go on to

molest children," and "[a]ny Guideline based on unsupported fears, rather than actual

1, 2000).

evidence, is far more likely to render an unreasonable sentence"); *United States v. Cruikshank*, 667 F. Supp. 2d 697, 703 (S.D. W.Va. 2009) ("Rarely able to catch the monsters that create the images, society reflexively nominates the consumers of this toxic material as proxies for the depraved producers and publishers."); *United States v. Phinney*, 599 F. Supp. 2d 1037, 1045 n.10 (E.D. Wis. 2009) ("[C]ourts should not assume that a defendant has or will commit additional crimes without a reliable basis."). The Commission has confirmed that the possession of even large numbers of images, including sado-masochistic images, is "generally not associated with significantly higher rates of [criminal sexually dangerous behavior]." *Child Porn Report* at 204.

There is no research to support the theory that criminal punishments have affected the child pornography markets since the advent of the Internet and file sharing programs. *Child Porn Report* at 98.

In addition, technology has changed the nature of this offense. In the past, child pornography had to be obtained in a risky and secretive manner for substantial sums of money, whereas today, images of child pornography are available for free in the privacy of one's home, with no planning and minimal effort. As a result, much less dangerous people commit this offense than was previously the case, even though the guideline range is much higher than it was previously. Before widespread dissemination on the Internet, only those bold enough to

seek out child pornography by contacting suppliers directly or through the mail were able to

obtain it. In 1994 and 1995, the government prosecuted a total of only 90 defendants

convicted of possessing, receiving, or distributing child pornography, and only 24% used a

computer. *See* U.S. Sent'g. Comm'n, *Report to the Congress: Sex Crimes Against Children* 29

(1996) [U.S. Sent'g Comm'n, *1996 Report*]. In 2011, the government prosecuted 1,645

defendants convicted of possessing, receiving, or distributing child pornography, and 97.4%

used a computer. U.S. Sent'g. Comm'n, *Use of Guidelines and Specific Offense*

*Characteristics* (2011); U.S. Sent'g Comm'n, 2011 *Sourcebook of Federal Sentencing*

*Statistics*, tbl.17.

The Internet, by rendering child pornography immediately and anonymously accessible,

has "facilitate[d]. . . a new kind of crime" that in most cases would not otherwise have been

committed. *See* Andreas Frei et al., *Paedophilia on the Internet—A Study of 33 Convicted*

*Offenders in the Canton of Lucerne*, 135 Swiss Med. Weekly 488, 492 (2005); *see also* Jérôme

Endrass et al., *The Consumption of Internet Child Pornography and Violent Sex Offending*, 9

BMC Psychiatry 43, 44 (2009); L. Webb et al., *Characteristics of Internet Child Pornography*

*Offenders: A Comparison with Child Molesters*, 19 Sexual Abuse 449, 450 (2007). In short,

the change in technology is relevant, in part, because it means that even as the population of

child pornography offenders has become less dangerous, punishment has greatly increased.

*See* Richard Wollert, PhD, *The Implication of Recidivism Research and Clinical Experience*

*For Assessing and Treating Federal Child Pornography Offenders: Written Testimony*

*Presented to the U.S. Sentencing Commission* at 4-5 (Feb. 15, 2012).

According to the Commission, "technological changes have resulted in . . . ready

accessibility of child pornography," including graphic sexual images of very young victims,

which "previously was not widely circulated." *Child Porn Report* at 6. Now that the "typical"

child pornography case involves images depicting "prepubescent children engaging in sexually

explicit conduct," *id.* at 84, the current guideline "does not adequately distinguish among

offenders regarding their culpability for their collecting behaviors" and is "overly severe for

some offenders in view of the nature of their collecting behavior," *id.* at 322-23.

One of the goals of the SRA was to provide for proportionality in punishment among

offenses of different seriousness. S. Rep. No. 98-225, at 45-46 (1983). The child pornography

guideline fails that goal, as several courts have noted. *See, e.g., United States v. Dorvee*, 616

F.3d 174, 187 (2010); *United States v. Beiermann*, 599 F. Supp. 2d 1087, 1106 (N.D. Iowa

2009); *Cruikshank*, 667 F. Supp. 2d at 702.

**2. Just punishment.**

One judge recently reported: "The last defendant this Court was required to sentence to the mandatory five-year prison term for receipt of child pornography, a 72–year old retired attorney, was beaten to death within days of arriving at the federal penitentiary." *Kelly*, 868 F. Supp. 2d at 1204 n.1; *see also Inmate Sentenced to 15 Years to Life in Prison for Beating-Murder of Fellow Inmate Believed to be in Custody for Child Molest[ation],* Orange County, California District Attorney Press Release, Mar. 21, 2012) (inmate convicted of misdemeanor possession of child pornography, a 72-year old attorney, was beaten to death within days of arriving at federal prison); Kristen Dize, *Harford County Sex Offender Killed in State Prison,* BELAIRPATCH, June 28, 2012; Rina Palta, *For the third time this month, a sex offender is killed in prison*, May 29, 2012.[4] As the above examples demonstrate, the risk of violent assault on anyone charged with these crimes is very real.

Mr. Sears also must register as a sex offender, with the publication of that information to the community and his friends and neighbors. Mr. Sears sexual offender designation will effectively make him a societal pariah for the next 15 years or more. He will be banned from living in many neighborhoods and even entire towns. *See, e.g.*, Ex. 4 (May 21,

---

[4]  Available at http://www.scpr.org/blogs/news/2012/05/29/6370/inmate-killed-la-prison/

2013 *New York Times* Op-ed, "Sex Offender Village" and October 1, 2013, *New York Times*,

"Restricted Group Speaks Up, Saying Sex Crime Measures Go Too Far"). Mr. Sears name and

address will be readily available on the Sex Offender Registry, something anyone with a

computer can view. Finding employment as a registered sex offender will be extremely

difficult. As set forth in the *New York Times* piece:

> We live in a society that is terrified of sex offenders, sometimes with good reason. But in some cases the perpetrators, and not just the victims, are denied justice. Every high-profile sex crime spawns a rush to do something about the "predators" among us. Unfortunately, these so-called solutions are doing more harm than good. In the past 25 years, the laws governing sex offenses have gone from punitive to draconian to senseless. The term "sex offender" simply covers too wide a range now, painting the few truly heinous crimes and the many relatively innocuous ones with the same broad brush. This overly broad approach wastes resources that could be better spent, for instance, on clearing the huge and unforgivable backlog of untested rape evidence kits.
> We see even deeper problems: the explosion of sex offender registries, stringent yet demonstrably ineffective residency restrictions, and the bizarre world of "civil commitment," where we punish what someone might do rather than what he or she has done. All of this suggests that our entire approach to dealing with sex offenders has gone tragically off the rails.

As several courts have recognized, the collateral consequences of conviction, such as

registration as a sex offender, are relevant to the "need" for the sentence imposed to reflect just

punishment. *See, e.g., United States v. Garate*, 543 F.3d 1026, 1028 (8th Cir. 2008) (on

remand from the Supreme Court for reconsideration in light of *Gall*, overruling its prior

holding that it was inappropriate for the district court to consider the lasting effects of being

required to register as a sex offender); *United States v. Pauley*, 511 F.3d 468, 474-75 (4th Cir.

2007) (in a case involving a conviction for possession of child pornography after *Gall*,

affirming the district court's finding that the defendant "warranted a lower sentence because he

lost his teaching certificate and his state pension as a result of his conduct," because

"[c]onsideration of these facts is consistent with § 3553(a)'s directive that the sentence reflect

the need for just punishment," *id.* § 3553(a)(2)(A), and "adequate deterrence," *id.* §

3553(a)(2)(B)); *United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) (affirming

below-guideline sentence based in part on court's findings that defendant suffered substantial

mental and personal stress as a result of his prosecution, because the court's findings "were

directly relevant to the § 3553(a) analysis, which requires sentences to reflect, among other

things, "the history and characteristics of the defendant," the need to "protect the public from

further crimes of the defendant," the need to "provide just punishment for the offense," and the

need to "afford adequate deterrence").

**B. The Need for Adequate Deterrence, 18 U.S.C. § 3553(a)(2)(B).**

The empirical evidence is unanimous that there is no relationship between sentence

length and general or specific deterrence, regardless of the type of crime. *See* Andrew von

Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research*

(1999) (concluding that "correlations between sentence severity and crime rates . . . were not

sufficient to achieve statistical significance," and that "the studies reviewed do not provide a

basis for inferring that increasing the severity of sentences generally is capable of enhancing

deterrent effects"); Michael Tonry, *Purposes and Functions of Sentencing,* 34 Crime and

Justice: A Review of Research 2829 (2006) ("[I]ncreases in severity of punishments do not

yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science

panels, all appointed by Republican presidents, reached that conclusion, as has every major

survey of the evidence."); David Weisburd et al., *Specific Deterrence in a Sample of Offenders*

*Convicted of White-Collar Crimes*, 33 Criminology 587 (1995) (finding no difference in

deterrence for white collar offenders between probation and imprisonment); Donald P. Green

& Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration*

*and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of

over a thousand offenders whose sentences varied substantially in prison time and probation

found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose

assigned by chance to receive prison time and their counterparts who received no prison time

were re-arrested at similar rates over a four-year time frame").

The Sentencing Commission has found that "[t]here is no correlation between

recidivism and guidelines' offense level. . . . While surprising at first glance, this finding

should be expected. The guidelines' offense level is not intended or designed to predict

recidivism." U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation*

*of the Federal Sentencing Guidelines*, at 15 (2004) ["U.S. Sent'g Comm'n, *Measuring*

*Recidivism*"]. And according to "the best available evidence, . . . prisons do not reduce

recidivism more than noncustodial sanctions." Francis T. Cullen et al., *Prisons Do Not Reduce*

*Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011). Nor does

lengthy imprisonment of child pornography possessors have any deterrent or preventive effect

on the production or dissemination of child pornography. As explained further below, this is in

part because the production and dissemination of child pornography is a widespread,

international problem. There is no evidence "remotely supporting the notion that harsher

punishment would reduce the flow of child pornography on the Internet." *Beiermann*, 599 F.

Supp. 2d at 1103; *id.* at 1103-04 ("[W]e cannot sentence Internet users and sharers of child

pornography fast enough or long enough to make a dent in the availability of such material on

the Internet," and while deterrence is a "laudable" goal, it "is not being achieved according to

any empirical or other evidence in this case or, for that matter, empirical evidence in any other

case or source that I am aware of."). The Commission acknowledges that there is no social

science research supporting the theory that criminal punishments "have affected commercial or

non-commercial 'markets' since the advent of the Internet and P2P file-sharing." *Child Porn*

*Report* at 98.

### C. The Need for Incapacitation, 18 U.S.C. § 3553(a)(2)(C).

A primary assumption underlying Congress's actions with respect to the child

pornography guideline has been that possessors of child pornography are likely to sexually

abuse children. This belief is contrary to the empirical research in general, and is wholly

unjustified under the specific facts and circumstances of this case. See e.g., Helen Wakeling et

al., *Comparing the Validity of the RM 2000 Scales and OGRS3 for Predicting Recidivism by*

*Internet Sexual Offenders*, 23 Sexual Abuse: J. Res. & Treatment 146, 164 (2011) (child

pornography offenders "do not, as a group, present a significant risk of escalation to contact

sexual offenses."); Jérôme Endrass et al., *The Consumption of Internet Child Pornography and*

*Violent Sex Offending*, 9 BMC Psychiatry 43 (2009) (study that followed 231 child

pornography offenders for six years after initial offenses found that only two offenders (0.8%)

committed a contact offense, and only nine offenders (3.9%) committed a non-contact sexual

offense, and concluded that "the consumption of child pornography alone does not seem to

represent a risk factor for committing hands-on sex offenses . . . at least not in those subjects

without prior convictions for hands-on sex offenses"); Michael C. Seto & Angela W. Eke, *The*

*Criminal Histories and Later Offending of Child Pornography Offenders*, 17 Sexual Abuse

201, 207-08 & tbl.III (2005) (finding that 1.3% of those who had committed child pornography

offending only recidivated with contact sex offenses; "our finding does contradict the

assumption that all child pornography offenders are at very high risk to commit contact sexual

offenses involving children."); L. Webb et al., *Characteristics of Internet Child Pornography*

*Offenders: A Comparison with Child Molesters*, 19 Sexual Abuse 449, 463 (2007) (finding

Internet-only offenders "significantly less likely to fail in the community than child molesters,"

and concluding that "by far the largest subgroup of internet offenders would appear to pose a

very low risk of sexual recidivism"). As one district court recently put it, "the empirical

literature [] generally concludes that there is little—if any— evidence of a direct correlation

between viewing child pornography and the viewer's commission of 'contact' sexual

offenses." *Marshall*, 870 F. Supp. 2d at 492.

Not only are child pornography offenders at low risk to re-offend in general, but Mr.

Sears is unlikely to recidivate given his history and characteristics. The Commission's

research demonstrates that employment, education, lack of criminal history, and family ties and

responsibilities all predict reduced recidivism, *see* U.S. Sent'g Comm'n, *Measuring*

*Recidivism* at 12-13 & Ex. 10; U.S. Sent'g Comm'n, *Recidivism and the "First Offender,"* at 8

(2004), as does substantial other research.[5] As the Commission reports, recent studies show

that "appropriate 'treatment interventions . . . are associated with lower rates of

recidivism—some of them very significant'" *Child Porn Report* at 278 & n.31 (citing a project

funded by the Department of Justice), and that "[p]olygraph testing of sex offenders is widely

accepted by experts as a critically important corollary of effective treatment." *Id.* at 282.

     In short, Mr. Sears   lack of a criminal record, age, strong family support from his entire

family, as well as the nature and circumstances of his crime, strongly support the conclusion that

he is unlikely to re-offend. While a small minority of defendants convicted of possessing or

distributing child pornography may again view child pornography and an even smaller minority

may molest children, Mr. Sears is simply not likely to be one of them. The sentence should

reflect the fact that Congress's contrary assumption is unfounded in this case. Supervised release

with appropriate conditions is more than sufficient to ensure that he never re-offends.

---

[5] *See* Miles D. Harer, Federal Bureau of Prisons, Office of Research and Evaluation, *Recidivism Among Federal Prisoners Released in 1987*, at 5-6, 54 (1994), http://www.bop.gov/news/research_projects/ published_reports/recidivism/oreprrecid87.pdf; *Correctional Service Canada, Does Getting Married Reduce the Likelihood of Criminality*, Forum on Corrections Research, Vol. 7, No. 2 (2005); Robert J. Sampson & John H. Laub,

*Crime and Deviance Over Life Course: The Salience of Adult Social Bonds*, 55 Am. Soc. Rev. 609 (1990); Robert J. Sampson, John H. Laub & Christopher Winer, *Does Marriage Reduce Crime? A Counterfactual Approach to Within-Individual Causal Effects*, 44 Criminology 465, 497-500 (2006); Shirley R. Klein et al., *Inmate Family Functioning*, 46 Int'l J. Offender Therapy & Comp. Criminology 95, 99-100 (2002).

**D. The Need for Medical Care and Correctional Treatment in the Most**

**Effective Manner, 18 U.S.C. § 3553(a)(2)(D).**

As a "sex offender," Mr. Sears would not be eligible for placement in a Bureau of

Prisons' prison camp. That is because one's status as a "sex offender" is a "Public Safety

Factor (PSF)" that BOP uses to bar placement at a prison camp. *See* P.S. 5100.08, Ch. 5 (Ex.

1). Sex offender treatment in the BOP typically is not begun until approximately three years

before release.

If the Court sentences Mr. Sears to five years, he will be able to  return to his family and

help raise his children.

**E. The Requested Sentence Avoids Unwarranted Disparities and Unwarranted**

**Similarities.**

This Court must consider the "need to avoid unwarranted sentence disparities among

defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. §

3553(a)(6). Whether any difference among sentences is warranted or unwarranted depends on

the individual circumstances of each case and their relationship to the purposes of sentencing.

"Unwarranted disparity is defined as different treatment of individual offenders who are similar

in relevant ways, or similar treatment of individual offenders who differ in characteristics that

are relevant to the purposes of sentencing." U.S. Sent'g Comm'n, *Fifteen Years of Guidelines*

*Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform* 113 (2004). As discussed, the guideline calculation gives heavy weight to factors based on assumptions about the seriousness of the offense and general deterrence that are unfounded in general and particularly in this case. The guideline range fails to take into account any of Mr. Sears characteristics demonstrating that a sentence of five years in custody is sufficient to protect the public, punish Mr. Sears, deter others, and that treatment and rehabilitation will be achieved in the most effective manner in the community upon his release.

In this case, a substantial variance is necessary to avoid both unwarranted disparity and unwarranted uniformity between Mr. Sears and other defendants. *See Gall*, 552 U.S. at 55 (in imposing a sentence of probation, district court appropriately "avoid[ed] unwarranted similarities"). This Court must also weigh sentencing practices in other courts against the § 3553(a) factors in this case and any unwarranted disparity created by the guideline itself. *Kimbrough*, 552 U.S. at 108. The data show that a sentence of five years in custody would not create unwarranted disparity.

In fiscal year 2011, only 32.8% of defendants sentenced under § 2G2.2 nationwide received a sentence within the guideline range, and 65.6% were below the range. Judges imposed below-range sentences in 48.1% of cases without a government motion, in 14.6% of

cases based on a government motion for a variance, and in 3% of cases based on a government

motion under § 5K1.1. *See* U.S. Sent'g Comm'n, *2011 Sourcebook of Federal Sentencing*

*Statistics*, tbl.28. In contrast, the average rate of below-range sentences without a government

motion in all cases was only 17.4% and the government sought variances in only 4.4% of all

cases. *Id.*, tbl.N.

A survey of other cases within this district suggest that a sentence of no more than 60

months would be well within the norm for the conduct in this case. A sampling of other cases

follows:

*United States v. Douglas Payne*, Cr. No. 11-cr-317 (ABJ). In a case involving both the

possession of child pornography and traveling for the purpose of engaging in sex with a child

Judge Jackson imposed a sentence of 60 months' imprisonment on both counts (to run

concurrently), to be followed by ten years of supervised release. The Sentencing Guidelines in

Mr. Payne's case were 78-97 months' imprisonment.

*United States v. Morehead*, Cr. No. 11-cr-258 (RLW) (Jan. 17, 2012). In another case

that involved both the possession of child pornography and traveling for the purpose of

engaging in sex with a child, Judge Wilkins imposed a sentence of 84 months, with 120 months

of supervised release. The Guidelines range in Mr. Morehead's case was 121-151 months'

imprisonment.

*United States v. Moreira*, 10-cr-002 (ESH): In this possession case, the defendant used peer-to-peer software to share files with an undercover law enforcement agent. When the defendant was arrested, law enforcement found over 800 images and 5 videos of child pornography, including images of prepubescent children, in the defendant's possession. While Mr. Moreira's Guidelines range was 78 to 97 months, Judge Huvelle sentenced him to 60 months' probation with 60 days incarceration to be served on weekends.

*United States v. Branco,* 09-cr-095 (ESH): Guidelines range of 108-135 months, Judge Huvelle sentenced the defendant to 65 months' imprisonment, after meeting Detective Palchak in a chat room, sharing child pornography, having disgusting conversations, and repeatedly talking about getting together for sex with a minor. Mr. Branco's sentence was only five months above the mandatory minimum sentence in that case.

*United States v. McHaney*, 08-cr-008 (TFH): Guidelines range of 97 to 120 months, Judge Hogan sentenced the defendant to 36 months' imprisonment. Though the charge in this case was possession of child pornography, the Statement of Facts accompanying his plea agreement indicates that the defendant also agreed to meet with a fictitious 13-year old boy for the purpose of having sex with him. When the defendant arrived at the meeting and was arrested, police found a flash drive in the defendant's possession that contained more than 600 images of child pornography, including images of children 3 to 5 years of age and young teens.

*United States v. Bryant,* 08-cr-170 (JR): Judge Robertson imposed a 40-month sentence in an 18 U.S.C. § 2423(b) and D.C. Code enticement case in which the defendant,

using his computer, agreed to meet with a fictitious 13 year old girl for the purpose of engaging

in sexual intercourse. When the defendant arrived at the meeting, the defendant had a video

camera and $1,000 cash. The Guidelines range for this defendant was 135 to 168 months'

imprisonment.

*United States v. Malakoff*, Cr. No. 09-cr-0051 (ESH). In a case involving a charge for

possession of child pornography, Judge Huvelle sentenced Mr. Malakoff, a 47-year old adult

male, to five years' probation. The advisory Guidelines range was 78-97 months. As with the

instant case, *Malakoff* involved both pornographic photos and videos. As stated by Judge

Huvelle, "I've viewed some of these photos, not all by any means, a short selection. And

they're totally repugnant, I don't know how else to describe them. . . . Having seen these

pictures, I realize that these videos are profoundly disturbing." Tr. at 32, 35. And yet, based

upon the other section 3553 factors, such as Mr. Malakoff's lack of any other criminal record, a

childhood sexual trauma, the punishment already inflicted by the conviction and sex offender

registration requirement, and Mr. Malakoff's deep roots in the community, the Court sentenced

Mr. Malakoff to no prison time at all, but rather five years' probation.

Judge Huvelle expressly addressed the issue of varying so significantly from the

Sentencing Guidelines range of 78-97 months. In addition to the factors noted above that were

specific to Mr. Malakoff, the Court noted that:

> [A] review of the case law, including the only relevant cases that I found in this jurisdiction . . . indicates *that a significant percentage of cases involve substantial downward variances*. Of the five cases that my probation department was able to identify in this jurisdiction where there was no mandatory minimum that controlled the sentence, there were three significant downward variances in three of the five cases.

Tr. at 40 (emphasis added).

One reason Judge Huvelle and the other judges of this Court consistently vary significantly downward from the Guidelines is that the Guidelines for the child pornography offenses "do not reflect the sentencing commission's exercise of its character[istic] institutional role. Therefore, they are not entitled to the usual deference." Tr. at 41. Quoting in part from Judge Roberts' bench ruling in *United States v. Matheron*, Crim No. 08-066 (RWR), Judge Huvelle stated in *Malakoff*:

> The base offense level was not derived from the sentencing commission's recommendation based upon its singular expertise and study of real sentencing date and national experience, the way the commission determined most other base offense levels. Over time, the level here was substantially increased, not as a result of studies by the expert body Congress created, but was ultimately key[ed] to the increased statutory maximum sentence and the statutory mandatory minimum sentences for the trafficking offenses. Moreover, the enhancement for the volume of images was created by legislation, not crafted or recommended by the commission based upon its careful study in correlation to sentencing goals under 3553.[6]

---

[6]    The legislative background on the enhancement based on the quantity of images, which was contained in the PROTECT Act, is particularly informative. As discussed in *Stabenow*, discussed *infra*, "two government attorneys convinced a novice Congressman to insert [these] dramatic changes to the child pornography Guidelines into an unrelated, popular bill, *without*

Nor does the guideline assure just punishment in individual cases. The enhancement for using a computer is a undifferentiated application that fails to distinguish the level of culpability for consuming images from that of child pornographers, or from offenders using the computer for commercial profit or mass distribution. The Supreme Court recently in 2009 in a case called [*Spears v. United States]* finally rejected the notion that policy disagreements with guideline cannot provide a basis for sentencing variances.

*Id.* at 41-42.

*United States v. Rowan*, 09-cr-225 (RMU): Guidelines range of 97 to 120 months, Judge Urbina sentenced the defendant to 24 months' imprisonment with 180 months of supervised release. Though the defendant was charged with possession only, the Statement of Facts accompanying his plea agreement indicates that the defendant distributed 16 images to an undercover officer through peer-to-peer computer software. Upon investigation, 826 images of child pornography were found in the defendant's possession, including images of infants and toddlers.

*United States v. Wright*, 09-cr-311 (ESH): Guidelines range of 33 to 41 months, Judge Huvelle sentenced the defendant to 60 months' probation. The defendant in this case used peer-to-peer software to download pornographic images. About 284 images of child pornography were found in the defendant's possession.

*United States v. Matheron*, 08-cr-66 (RWR): Guidelines range of 46 to 57 months, Judge Roberts sentenced the defendant to 12 months and 1 day of imprisonment. The 58-year old defendant was found in possession of between 300 and 600 images of child pornography.

---

*notice* to the Sentencing Commission. *Id.* at p. 19. Senator Diane Feinstein compared the changes to writ[ing] the criminal code on the back of an envelope. *Id.* at 22.

*United States v. DiFazio*, 07-cr-022 (RJL): Guidelines range of 63 to 78 months, Judge Leon sentenced the defendant to 12 months' imprisonment. Law enforcement recovered 458 images of child pornography.

*United States v. DeGrange,* 13-cr-297 (BAH): Guidelines range of 87 to 108 months, Judge Howell sentenced the defendant to 57 months.   Law enforcement recovered 200 images of child pornography.

*See also United States v. Clary*, 12-019 (RLW) (24 months)*; United States v. Samuel Rankin*, 11-366 (JDB) (32 months)*; United States v. Welch*, 11-153 (JEB) (27 months); *United States v. Legg*, 11-131 (CKK) (30 months); *United States v. Copeland*, 11-092 (JDB) (24 months); *United States v. Nelson*, 11-059 (RWR (25 months); *United States v. Stankavage*, 11-045 (CKK) (24 months); *United States v. Johnson*, 10-228 (RBW) (sentenced to 12 months after pleading to D.C. Code offense); *United States v. Unachukwu*, 06-358 (GK) (24 months); and *United States v. Bartolain*, 06-236 (GK) (18 months).

Notably, sentences imposed since the Commission's 2013 Report to Congress have been almost uniformly considerably less than those that preceded the Report. For example, in *United States v. Reed*, 08-CR-287 (RWR), a defendant charged with possession of child pornography and traveling with the intent to engage in illicit sexual conduct, was sentenced to 90 months, a within guidelines sentence. (The case appears to have involved particularly

egregious chats, suggesting a desire to harm and large quantities of catalogued child

pornography). The same Judge sentenced another defendant charged with distribution of child

pornography with a higher guideline range (121 to 151 months) and a mandatory minimum of

60 months, to a sentence of 70 months. *United States v. Hedgepeth*, 08-CR-251 (RWR).

While this sentence was also imposed prior to the Commission's 2013 Report to Congress, the

Court adopted many of the Stabenow arguments discussed below which subsequently made

their way into the Commission's Report. The Court explained that:

> I find that Section 2G2.2A(2) provides less weighty guidance in achieving the purpose
> of fair and just sentencing, a sentencing judge's highest duty. The base offense level
> was not derived from the Sentencing Commission's recommendation based on its
> singular expertise and real sentencing data and national experience the way the
> Commission determined most other base offense levels. Over time, the level here was
> substantially increased by directive legislation not stemming from studies by the expert
> body Congress created, and was ultimately keyed to the statutory mandatory minimum
> sentence. Moreover, the enhancement for the volume of images, too, was created by
> legislation, not crafted or recommended by the Commission based on its careful study
> and correlation to sentencing goals under Section 3553.

*United States v. Hedgepeth*, 08-CR-251 (RWR), Sentencing Transcript at p. 16.

More recent cases have resulted in shorter sentences. *See e.g., United States v.*

*SEALED*, 13-006 (RWR) (in case where guideline range was 151 to 188, defendant sentenced

to 30 months for traveling, possession, and distribution after receiving motion under 5K1.1);

*United States v. George Marion*, 13-CR-02 (ESH) (defendant received 50 months for travel

and possession); *United States v. Metz* (RCL) (defendant received 36 months for possession

despite government's request for 87 months); *United States v. Gange*, 13-038 (JEB) (defendant

who distributed large quantities of photos he produced pleaded guilty to possession and was

sentenced to 46 months); *United States v. Dietterle*, 13-CR-080 (ABJ) (defendant who

distributed pornography and discussed meeting to engage in sexual contact with a minor

sentenced to 40 months for possession of pornography over government's request for 97

months). While there are other cases that involved slightly longer sentences, we suggest that

the nature and circumstances of this offense, coupled with the defendant's history and

characteristics support a sentence of no more than 20 months.

Cases involving travel with the intent to engage in illicit conduct typically result in

much lighter sentences than that likely to be sought by the government in this case. *See e.g.*

*United States v. Kenneth Longerbeam*, 08-CR-17 (TFH) (MPD Officer traveled in full uniform

to engage in sex with a 14 year old boy, sentenced to 36 months); *United States v. William*

*Dulany*, 08-CR-32 (TFH) (defendant made arrangements to meet 14 year old boy in hotel room

for sex, sentenced to four months); *United States v. Tarum Makkar*, 06-CR-231 (RJL)

(defendant traveled to have sex with 13 year old girl, sentenced to 18 months); *United States v.*

*Wei Chin*, 08-124 (HHK) (defendant who traveled to have sex with 14 year old girl and had

sexual toys, handcuffs, rope and plastic sheeting when stopped, sentenced to 32 months);

*United States v. Kyle Bartolain*, 06-CR-236 (GK) (defendant traveled to have sex with 13 year old girl, sentenced to 18 months in prison.)

*United States v. Sollerra,* 14-cr-225 (TSC) Guideline range of 135-168 months, Judge Chutkan sentenced the defendant to 60 months for Travel with Intent to Engage in Illicit Sexual Conduct and Possession of Child Pornography. The defendant had traveled to the District of Columbia to meet with an eight year old girl.

*United States v. SEALED*, 17-21 (TSC) (in case where guideline range was 87 to 108, defendant sentenced to 42 months for conspiracy to commit sex trafficking of children after receiving motion under 5K1.1)

*United States v. DiFazio*, 07-cr-022 (RJL): Guidelines range of 63 to 78 months, Judge Leon sentenced the defendant to 12 months' imprisonment. Law enforcement recovered 458 images of child pornography.

Similarly, cases in other jurisdictions also demonstrate the sufficiency of a lower sentence in this case. In *United States v. Dorvee*, 604 F.3d 84, 95 (2d Cir. 2010), the Second Circuit reversed a within-Guidelines sentence for the distribution of child pornography as substantively unreasonable. Relying in part on the flaws in the child pornography guidelines discussed infra, the court afforded the guideline very limited deference. *Id.* at 95 ("the district court was working with a Guideline that is fundamentally different from most and that . . . can lead to unreasonable sentences that are inconsistent with what § 3553 requires"). The court

relied on the Sentencing Commission's most recent report regarding the history of the child

porn guideline, as well as other Commission reports and statistics in rejecting the district

court's sentence as unreasonable.

In *United States v. Autery*, 555 F.3d 864 (9th Cir. 2009), the Ninth Circuit upheld a

sentence of five years' probation in child pornography case, where the advisory Guidelines

range was 41-51 months. Offense conduct involved over 150 images of child pornography.

The district court had justified its probationary sentence on the basis that, *inter alia*, the

defendant enjoyed the continuing support of his family, and a sentence of probation would

allow the defendant better psychiatric therapy. *Id.* at 868.

In *United States v. Rowan*, 530 F.3d 379 (5th Cir. 2008), the Fifth Circuit upheld a

sentence of five years' probation in a child pornography case, against an advisory Guidelines

range of 46-57 months.

In *United States v. Stall*, 581 F.3d 276 (6th Cir. 2009), the Sixth Circuit upheld a

non-Guideline sentence of one day imprisonment and a 10-year period of supervised release for

a defendant convicted of possessing between 10 and 150 images of child pornography.

In *United States v. Huckins*, 529 F.3d 1312 (10th Cir. 2008), the Tenth Circuit upheld

an 18-month sentence where the advisory Guidelines sentence was 78-97 months.

In *United States v. Rausch*, 570 F. Supp. 2d 1295 (D. Colo. 2008), the court imposed a one-day sentence where the advisory Guidelines range was 97-120 months. In *United States v. Phinney*, 599 F. Supp. 2d 1037 (E.D. Wis. 2009), the court imposed a six-month sentence where the advisory Guidelines range was 46-57 months. In *United States v. Stern*, 590 F. Supp. 2d 945 (N.D. Ohio 2008), the court imposed a sentence of one year and one day where advisory Guidelines range was 46-57 months.

A sentence of no more than 60 months would be well within the norm and would avoid unwarranted sentencing disparity.

In determining whether to incarcerate Mr. Sears, the Court shall consider, among other factors, the expected costs to the government of any imprisonment, supervised release, or probation component of the sentence. 18 USC § 3572(a)(6) and USSG §5E1.2(d)(7). The recent advisory from the Administrative Office of the United States Courts suggests that the Court use an annual cost of $36,300 for imprisonment, an annual cost of $35,544 for community confinement, and an annual cost of $4,368 for supervision.

### Factors of Mr. Sears that the Court Should Consider under § 3553(a)(1)

A. *Nature of the Offense*

While Mr. Sears committed a very serious crime, he has expressed regret and remorse for his actions. These were the 9 worst days of his life in 2017. Not to downplay the seriousness of

his behavior,  his actions could best be described as unsophisticated. He was not distributing these pictures for profit but for what he thought was peer to peer viewing. He wanted to plead  in this case upon being arrested.


*B. Characteristics of the Defendant*

One thing that can be said about Jeremy Sears is that he is a hardworking man. He has always done jobs requiring physical labor.  He works long hours in bad conditions and has always done his best to  provide for his family.

Mr. Sears, like many others, comes from a broken home. His parents divorced when he was 10 years old. His mother left the home and he and his younger sister were raised by an abusive, alcoholic father. When he was 16 years old, his father fell down the basement stairs carrying firewood.  His father was disabled after that and Jeremy had to take on more responsibilities that he was not equipped to handle. His mother had little involvement in his life after his parents' divorce.

He has a series of health problems. He has asthma and COPD, high blood pressure, sleep apnea, and he suffers from depression. He has a long history of substance abuse that he will need help in dealing with.

Jeremy had a host of learning disabilities and was enrolled in many special education classes. He has not graduated from high school. He is enrolled in the GED program at D.C. Jail.

He does have a very supportive family and a host of letters in support of Jeremy are attached to this memorandum in aid of sentencing. This will be of great importance when reintegrating back into society.

**CONCLUSION**

Mr. Sears would like the opportunity to show the Court that he can be a productive member of society.  He would like the opportunity to help raise his daughter and son, so that they would not make the same mistakes that he has made.

Therefore, for the foregoing reasons, Mr. Sears respectfully requests a sentence of no more than 60 months incarceration. Mr. Sears requests that he be assigned to FMC Devins in Ayers, Massachusetts, so that he can get the medical help that he needs.

Respectfully submitted,
/s/
Mark J. Carroll, # 414-619
9520 Reach Road
Potomac, Md. 20854
Tel. No. (301) 762-6453
Fax No. (301) 762-6454
Cell No. (443) 421-3475
Markjcarroll@hotmail.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of May, 2019, a copy of the foregoing Motion was served via the ECF system, or by email.